# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

KATRENIA THOMPSON,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀CV 00-BU-3664-S
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
THE BOARD OF TRUSTEES⠀⠀)
OF THE UNIVERSITY OF⠀⠀⠀)
ALABAMA IN BIRMINGHAM,⠀)
and THOMAS CARTER,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀Defendants.⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)

ENTERED

SEP 0 6 2001

---

## Memorandum Opinion

---

In the above-styled action Plaintiff Katrenia Thompson brings claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1983, based upon charges that her former employer, the University of Alabama at Birmingham ("UAB"), a division of Defendant University of Alabama Board of Trustees ("Board"), and her former supervisor, Defendant Thomas "Tim" Carter, discriminated against her on the basis of race and subjected her to unlawful retaliation for complaints she had made. Now before the Court is Defendants' motion for summary judgment, filed July 16, 2001. (Doc. 16). The parties have filed evidence and briefs in support of their respective positions on the motion, which is now ripe for decision. Based upon the record and the arguments

of counsel, the Court concludes that Defendants' motion for summary judgment is due to be granted.

## I. SUMMARY JUDGMENT STANDARDS

On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. Celotex, at 323. To do so, it is not enough for a movant to state merely that the non-movant cannot prove his claim; the movant must, rather, refer the Court to that portion of the record evidence that either negates an essential element of the non-movant's claim or that affirmatively shows that there is an absence of evidence such that the non-movant will be unable to meet his burden of proof as to an element of his claim. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). However, once the moving party has satisfied its initial burden, in order to avoid the entry of summary judgment, the non-movant must present evidence "set[ting] forth specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e). Rice-Lamar v. City of Ft.

Lauderdale, Fla., 232 F.3d 836, 840 (11th Cir. 2000). In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. Rooney v. Watson, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing Hale v. Tallapoosa Co., 50 F.3d 1579, 1581 (11th Cir. 1995)). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151 (2000) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p.299).

## II. BACKGROUND[1]

Plaintiff, who is African-American, was hired by UAB in October 1997 to work as a central files clerk in a hospital laboratory. In January 1999, she was transferred and began working at another position within UAB, at the Kirklin Clinic Laboratory (hereinafter the "lab"). At that time, Defendant Carter, who is white, became Plaintiff's supervisor, and it was he who approved Plaintiff's transfer into the lab. Carter, in turn, reported to Florence "Flo" Peters, the Administrative Director of Outpatient/Outreach Laboratories in the Kirklin Clinic. Plaintiff, like most of the employees working in the lab, held the title of Medical Laboratory Assistant ("MLA"). More specifically, she worked as a phlebotomist in the collections area of the lab. That is, she used a needle to draw and collect blood

---

[1] "The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record. These are the 'facts' for summary judgment purposes only. They may not be the actual facts. See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994)." Underwood v. Life Ins. Co. of Georgia, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Fla. 1998).

specimens from patients for use in testing.

In addition to such collections work, the two other primary tasks performed by employees in the lab were "order entry," which involved typing patient and test registration data into a computer, and specimen processing. Newly hired MLA's were initially assigned to perform collections work, and at some point thereafter they would normally later receive training required to perform order entry and processing duty assignments. Once an MLA received such training, they were eligible to apply for a promotion to Medical Clinical Laboratory Assistant ("MCLA"), which carried a higher pay grade, when such positions became available. However, even if they remained at the MLA level, employees who had been trained would be rotated between collections and non-collection duty stations within the lab. Although assignments to non-collection stations did not necessarily involve higher pay, Plaintiff and other employees preferred such assignments over the collections work. This was primarily because collections work was more physically demanding, as there was a rule that employees doing collections work were not allowed to sit if there was a patient in the area, which was almost all of the time, while employees in other areas of the lab were allowed to sit on a more regular basis. The non-collections assignments were also viewed as less stressful and slower-paced than collections work, where employees were evaluated based largely upon how many "sticks," i.e., patient sample collections, they performed per hour.

At the request of Flo Peters, Sandra Sledge and Tammie Collins, who are representatives from UAB's Human Resources office, headed an employee relations committee (hereinafter the "Committee") formed in 1999 to address issues raised by lab employees indicating dissatisfaction with their work environment. Plaintiff,

like most employees, did not attend Committee meetings. Rather certain employees volunteered to act as designated representatives from a given area of the lab. Those representatives would attend the Committee meetings and relay various grievances communicated to them by the other employees.

During Plaintiff's tenure, a large majority of the employees working regularly in the lab were African-American. For example, the record indicates that in August 1999, approximately 16 employees, including Plaintiff and the two "lead" MCLA's, Phyllis Kimbrough and Tyrone Williams, were African-American. About seven workers, including Carter and Pat Franklin, who trained employees on the use of medical technologies and the computer system, were white. One employee was of Asian decent. The decisions on who was to be hired were made by Carter.

Plaintiff indicates, however, that she and some other black employees had alleged to the representatives attending the Committee meetings on their behalf that they believed, among other things, that Carter "was being unfair to blacks" and had complained that they "weren't given the same privileges as white . . . employees." Plaintiff's Depo. at 154-55. Plaintiff further relates that she and these other employees suggested that Carter mistreated them and kept them in the collections area where they could not sit down, take breaks, or talk, while rotating white employees to non-collection stations more often and sooner after being hired. In fact, one of the Committee representatives from the employees of the collections area, Marion Webb, who is black, confirms that Plaintiff, as well as other black lab employees, made such complaints. Webb Depo. at 11-12.

The Committee held several meetings in May and June 1999. The recorded notations from those meetings, however, do not indicate that any matters relating

specifically to race were discussed.  Rather, the issues raised appear to have dealt with a perceived lack of general fairness, often in connection with the Hospital's modified no-fault attendance policy,[2] and a perceived lack of respect on the part of supervisors towards their subordinates.[3]  Following the completion of the Committee meetings, there was a change in lab policy to the effect that employees were no longer required to "swipe" in and out during their breaks on the lab's computerized time clock system.  However,  Plaintiff and other employees, particularly those who were African-American, were disappointed in the Committee's failure to affect more significant changes in the way the lab operated and in the way Carter treated them.

---

[2]The differentiation between excused and unexcused absences is what distinguishes a "modified" no-fault attendance policy from the "pure" variety, which by definition would make no distinction between excused and unexcused absences.  See Dean Foods Co. v. United Steel Workers of America, 911 F.Supp. 1116, 1120 n.1 (N.D. Ind. 1995).

[3]The notes from the first Committee meeting, held on May 20, 1999, contains a "List of issues raised by the [representative] volunteers" stating as follows:
1. Loss of grace period for tardiness under the Hospital Attendance Policy
2. Attitudes – communication styles of supervisors
3. Lack of consideration for staffs' (sic) opinion – no input in decision making
4. Supervisory instruction to avoid personal conversations with certain job classifications
5. Excessive screening of personal phone calls
6. Blanket management – punishing entire staff for actions of a few
7. Appropriateness of no-fault [attendance] policy, especially for sick time
8. Consideration of points assessed [under attendance policy] for tardiness from lunch and breaks
9. Educational Training
10. [The Kirklin Clinic] sends specimens [to the lab] unprocessed
11. Inability to take breaks, vacation/ph time – not enough staff

These and similar issues seem to have been discussed at the subsequent meetings.  See Defendant's Exhibit K.  While some of these issues obviously could have racial overtones, there is no indication that any connection was expressly made at the Committee meetings between the grievances and race.

Plaintiff alleges that on the morning of October 5, 1999, she was the "ringleader" of a discussion that took place in the lab, where a number of employees talked about how they believed that the Committee had been ineffectual and that Carter "[was] still just as prejudiced and racist as [he had] always been and that nothing was ever going to change." Plaintiff's Depo. at 157. Plaintiff relates that among the particular actions of which they expressed disapproval that morning were: how Carter had given Dana Jackson, a white employee, an earlier shift even though Plaintiff, who had greater seniority, had previously asked for one, id. at 34-35; how Carter talked to them and watched them in a way that made them feel uncomfortable, id. at 37-38; how he had yelled at Sherrill Peterson,[4] a black female lab employee, to get back to work while she was in the bathroom, see id. at 39-41; and how Carter had promoted David Bush, a white employee, over Plaintiff, who had been working at UAB longer than Bush. Id. at 43-46. Plaintiff relates that one of the other employees made the statement that no one was going to do anything about Carter "and his ways." Plaintiff's Depo. at 32. But Plaintiff responded with words of encouragement, that she believed that the Kirklin Clinic and UAB would not continue to allow Carter to do things as he had been and that the employees just had to "stick together." Id.

At about 1 p.m. that same day, October 5th, Plaintiff was stuck by a used needle which had been discarded in an improper fashion by another lab employee, whom Plaintiff believed to be Dana Jackson. She proceeded to the Employee Health office to get tested for HIV and to fill out a report. While there, Plaintiff

---

[4]In her deposition, Plaintiff erroneously refers to Peterson as "Peters," and in that transcript, Peterson's first name, Sherrill, is spelled incorrectly as "Cheryl."

complained to the nurse on duty that she had been stuck with a dirty needle because of an employee's negligence and that such would not have happened if Carter would hire more competent people or spend more time training people so they would know how to discard needles properly.  When Plaintiff left the Employee Health Office, she returned to the lab and worked the remainder of her shift.

The following afternoon of October 6, 1999, Carter called Plaintiff into his office and advised her that her employment was terminated pursuant to UAB's attendance policy.  Under that policy, employees accrued points or half-points each time they were tardy or had an absence, and employees were to be automatically terminated once it was determined that they had accumulated eleven or more points within a floating twelve-month period.  At the meeting, Carter gave Plaintiff a memo stating that she had accrued her eleventh attendance point on August 30, 1999, resulting in her termination.  Plaintiff asked Carter whether any other employees in the lab ever had continued to work after having more than eleven points.  Carter answered that there were not.  Plaintiff stated that she thought it was unfair that she was being terminated because she knew that Phyllis Long and Heather Lunsford, who were two white employees, had more points than she had but were not fired.  Carter replied such was not the case and that he was sorry, adding that he did things fair and tried to "be by the book."  Finally, Carter told Plaintiff to report to Human Resources for her exit interview, which she did.

Anita Bonasera, a representative in the Employee Relations office in UAB's Human Resource Management department, administered Plaintiff's exit interview. At that interview, Plaintiff reiterated her complaints that Carter had not applied the

attendance policy consistently, naming Lunsford and Long as employees who she believed had accrued more points than she, Plaintiff, had but had not been fired by Carter.  Plaintiff also purportedly told Bonasera that she felt like Carter was discriminating against her because she was black and because she had complained to human resources about Carter.  Plaintiff claims that Bonasera said that she felt pretty sure that the matter would be straightened out when she could get in touch with Flo Peters and that she would get back in touch with Plaintiff.[5]  Subsequently, however, Bonasera and Peters contacted Plaintiff and told her that they had reviewed the records and concluded that the attendance policy had been applied consistently and that Carter's termination decision was not going to be overturned.

After pursuing administrative remedies with the Equal Employment Opportunity Commission ("EEOC"), Plaintiff filed this action on December 20, 2000.  In Count I of her complaint, she claims that the Board is liable under Title VII, based upon allegations that she has been subjected to disparate treatment because of race.  Plaintiff asserts that Carter treated black employees differently than white employees in regards to work assignments, duties, and discipline.  In Count II, Plaintiff charges that she was discharged because of race, in violation of Title VII.  In Count III, Plaintiff asserts that the Board is liable under Title VII because she was terminated in retaliation for complaining about Carter and about

---

[5]Bonasera's account of Plaintiff's exit interview is substantially different.  She admits that Plaintiff complained to her that Carter was not applying the attendance policy consistently, but she denies that Plaintiff ever brought up the issue of race.  Bonasera claims that Plaintiff gave her the names of three employees who Plaintiff thought had more points than she did but were not fired: Phyllis Long, Tausha Bettis, and Valerie Jordan.  Bonasera suggests that Plaintiff did not state the race of these employees and that she, Bonasera, was unaware of their race at the time of the meeting.  Long is white, while Bettis and Jordan are black.

race discrimination. And in Count IV, she asserts a claim under 42 U.S.C. § 1983 against Carter only, in his individual capacity. Specifically, Plaintiff claims that she was denied equal protection of the law, in violation of the Fourteenth Amendment, in that Carter allegedly discriminated against her based on race and retaliated against her for complaining about him and about race discrimination. Following the completion of discovery, Defendants filed the instant motion for summary judgment.

## III. DISCUSSION

### A. The Race Discrimination Claims

Plaintiff alleges that she was discharged and suffered various other adverse actions because of her race. Plaintiff contends that the Board, as her legal employer, is liable for such under Title VII, which makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Plaintiff also claims that Carter made the allegedly discriminatory employment decisions in question and that he thereby violated her rights under the Equal Protection Clause of the Fourteenth Amendment. Plaintiff brings suit against Carter alone in his individual capacity under 42 U.S.C. § 1983, which provides a cause of action against a person who, acting under color of law, has deprived another of a constitutional right. See Edwards v. Wallace Community College, 49 F.3d 1517, 1522 (11th Cir. 1995).

Where, as here, a plaintiff alleges Section-1983-equal-protection and Title VII-disparate-treatment claims as parallel causes of action alleging that his employer

intentionally discriminated against him on the basis of race, the analytical framework and elements to be proven are the same for both types of claim.  See Cross v. State of Ala., State Dept. of Mental Health & Mental Retardation, 49 F.3d 1490, 1507-08 (11th Cir. 1995); Busby v. City of Orlando, 931 F.2d 764, 777 (11th Cir. 1991); Lee v. Conecuh County Bd. of Educ., 634 F.2d 959, 962 (5th Cir. Jan. 1981).[6]  Thus, the Court will discuss Defendants' motion for summary judgment on Plaintiff's Title VII and equal protection race discrimination claims with a single analysis.[7]

Plaintiff attempts to prove her claims of race discrimination, as to all alleged adverse actions, using circumstantial evidence.[8]  When circumstantial evidence is sought to be used to prove a discrimination claim, courts use the analytical

_____

[6]All decisions of the United States Court of Appeals for the Fifth Circuit handed down prior to the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[7]Carter argues that he is entitled to qualified immunity on Plaintiff's section 1983 claims alleging that he fired Plaintiff and otherwise discriminated against her in employment because of race. "Qualified immunity shields a § 1983 defendant from liability for harms arising from discretionary acts, as long as the discretionary acts do not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known." Jackson v. Sauls, 206 F.3d 1156, 1164 (11th Cir. 2000).  However, there can be no doubt that at the time of the operative facts in this case, it was clearly established by binding precedent in this circuit that intentional discrimination by a state actor in the workplace on account of race violated the Fourteenth Amendment.  See Lambert v. Fulton County, Ga., 253 F.3d 588, 597 (11th Cir. 2001) (citing Smith v. Lomax, 45 F.3d 402, 407 (11th Cir. 1995); Yeldell v. Cooper Green Hosp., Inc., 956 F.2d 1056, 1064 (11th Cir. 1992).  The Court concludes, therefore, that Carter is not entitled to qualified immunity on Plaintiff's § 1983 claims alleging race discrimination in her employment.  Whether Carter is entitled to summary judgment on Plaintiff's race discrimination claims will depend upon the evidence going to the merits of such claims.

[8]Plaintiff does not contend that she might offer direct evidence or statistical evidence of race discrimination, the other avenues by which she might have attempted to prove her Title VII discrimination claims.  See Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981). Under this framework, the plaintiff must first establish a prima facie case of discrimination, which creates a presumption of discrimination. The employer must then produce sufficient evidence to indicate that it took the employment action in question for one or more legitimate, nondiscriminatory reasons. If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to discredit the proffered nondiscriminatory reasons by showing that they are merely a pretext for unlawful discrimination. See McDonnell Douglas, 411 U.S. at 802-05; Burdine, 450 U.S. at 252-256.

### 1. The Termination Claims

The Board argues that Plaintiff cannot make out a prima facie case of discrimination on her claims alleging that she was terminated because of race. First, the Board contends that, in order to establish a prima facie case of discriminatory discharge, Plaintiff must show that she was replaced by a person of another race. The Board emphasizes that Plaintiff cannot do so because the evidence shows without dispute that she was replaced by an African-American.

In order to establish a prima facie case, a plaintiff must present " 'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion . . . .' " O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312 (1996) (quoting Teamsters v. United States, 431 U.S. 324, 358 (1977)). It is well established that a plaintiff claiming that she was discharged because of race generally may satisfy that burden by showing that the employer

replaced her with a person of another race. See, e.g., Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1290 (11th Cir. 1998); Marks v. Prattco, 607 F.2d 1153, 1155 (5th Cir. 1979). Also cf. O'Connor, 517 U.S. at 312-13 (indicating that an inference of unlawful age discrimination may be raised by showing that the plaintiff was replaced by someone "substantially younger"). However, such does not imply that evidence of replacement by a person of another race is a <u>necessary</u> element of a prima facie case, contrary to Defendants' suggestion. Indeed, the Eleventh Circuit has long held that a plaintiff claiming discriminatory discharge is not precluded from establishing a prima facie case using circumstantial evidence even though she may have been replaced by a person within the same protected classification. See Hawkins v. Ceco Corp., 883 F.2d 977, 984 (11th Cir. 1989); Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1560 (11th Cir. 1986); Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984). See also Howard v. Roadway Exp., Inc., 726 F.2d 1529, 1534-35 (11th Cir. 1984) (holding that a plaintiff had established a prima facie case of racially discriminatory failure-to-hire notwithstanding evidence that the position sought by the plaintiff was ultimately filled with a person of the same race as the plaintiff). Cf. O'Connor, 517 U.S. at 312 (noting in a case brought under the Age Discrimination in Employment Act, "The fact that one person in the protected class has lost out to another person in the protected class is . . . irrelevant, so long as he has lost out <u>because of his age</u>." (emphasis original)).

Here, Plaintiff has not been able to dispute Defendants' evidence showing she was replaced by an African-American. However, a plaintiff fired for misconduct may also establish a prima facie case of racially discriminatory discharge if she

shows that she was qualified for the job from which she was fired and that an employee of another race was guilty of the same or similar misconduct for which the plaintiff was discharged but was retained. See Alexander v. Fulton County, Ga., 207 F.3d 1303, 1336 (11th Cir. 2000); Lathem v. Dep't of Children and Youth Servs., 172 F.3d 786, 792 (11th Cir. 1999); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997); Nix, 738 F.2d at 1185-87. It is upon this alternate formulation dealing with the differential application of work or disciplinary rules that Plaintiff attempts to found her prima facie case.

There is no dispute that Plaintiff was qualified to do her job, so the question is, therefore, whether Plaintiff can show that similarly situated white employees were guilty of similar misconduct but were treated more favorably than she was. On that front, Plaintiff alleges that while she was fired after accumulating 11 points under the UAB attendance policy,[9] two white employees, Phyllis Long and Heather

---

[9]Plaintiff does not dispute that her attendance records state that she had accumulated the 11-or-more points that would qualify her for dismissal under UAB's attendance policy. At times, Plaintiff seems to hint in her brief that the accuracy of the records cannot be trusted because they were compiled by Carter. However, in the absence of evidence tending to show that the records were altered or that Carter discriminatorily miscounted attendance points, Plaintiff's speculative arguments that such occurred do not create a genuine issue of fact. Also, at various places in her brief, she would seem to question the general fairness of the no-fault policy and aspects regarding how points were tallied thereunder. However, even if it is assumed that the lab's no-fault attendance policy could be reasonably viewed by some as unduly rigid, as long as the policy is applied rigidly to employees of all races, then federal anti-discrimination statutes can provide Plaintiff no remedy. Finally, Plaintiff summarily asserts that "many" of her points were for absences covered by the Family Medical Leave Act, Plaintiff's Brief at 50, and thus should not have counted against her under UAB's policy. See Defendant's Exhibit H at 5. The FMLA forbids an employer from counting FMLA-qualifying absences against an employee under a no-fault attendance policy. See 29 C.F.R. § 825.220(c). However, Plaintiff has not asserted a claim under the FMLA, and to the extent that Plaintiff may be offering this allegation to show that Carter may have been wrongfully assigning attendance points to Plaintiff in a racially discriminatory attempt to get her fired, Plaintiff has offered no evidence tending to prove any attendance points assigned to her might have even potentially been covered by the FMLA.

Lunsford, likewise had 11 points but were nonetheless retained. Defendants assert that such is not the case. Defendants point both to Bonasera's testimony that under UAB's policy, Carter, as a supervisor, would not have discretion to retain an employee who had accumulated 11 or more points, and to Carter's testimony that he did not allow any other employee to remain employed after he was aware that they had reached the 11-point mark. Defendants also refer the Court to employee attendance records regularly compiled by Carter from printouts of the lab's computerized time clock system, which indicate that neither Lunsford nor Long had accumulated 11 points before each voluntarily resigned. Defendants Exhibit I. Plaintiff nonetheless maintains that she has presented sufficient evidence to allow a jury to find that Long and/or Lunsford had accrued the 11 points required for discharge under the UAB attendance policy, but were permitted to retain their employment.

Plaintiff first points to her own deposition testimony and that of three other employees, Sherrill Peterson, Tarcha Herron, and Clara Moulton, as evidence indicating that Long had more than 11 points and was not fired. However Plaintiff acknowledged that she believed such was the case only because Long told her that. Plaintiff's Depo. at 25-27. Moulton and Herron each stated only that Long had told her that she, Long, had 11 points and was not fired, Moulton Depo. at 27, Herron Depo. at 33, while Peterson said merely that she had "kind of heard" that same rumor, Peterson Depo. at 29. The Court agrees with Defendants that to the extent Plaintiff offers these statements as proof of the fact that Long actually had more than 11 points, they are not based upon personal knowledge and are hearsay that cannot be considered on summary judgment. See Fed. R. Civ. P 56(e); Macuba v.

Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999).

Long, however, also expressly acknowledged at her own deposition that she believed she had 11 points and was not fired. Long Depo. at 15, 17. However, the issue is not whether Long believed she had 11 points. Rather, the relevant question is whether the evidence indicates that the decisionmaker, Carter, knew or believed that Long or another non-African-American employee actually had or should have had 11 points and still did not terminate her or him. Cf. Bogle v. Orange County Bd. of County Com'rs, 162 F.3d 653, 658-59 (11th Cir. 1998) (indicating that other employees who are guilty of similar misconduct as the plaintiff are still not similarly situated if there is no indication that the employer was aware of such misconduct by the other employees).

Upon further questioning by defense counsel, Long explained that she believed she had 11 points based upon a meeting she had with Carter in his office. She testified regarding that conversation as follows:

Q. . . . .What is the basis for your statement that you had accumulated more than eleven points and yet were not terminated?

A. What was the basis of it? What do you mean?

Q. Yes, ma'am. I mean, what's the source of your knowledge that you have had more than the number of points to be terminated?

A. I think at some point in time Tim [Carter] had called me in the office and discussed it with me.

Q. Did he tell you you had more than eleven points?

A. Yes, he did.

. . . .

Q.   Okay.  Tell me the substance of that discussion.

A.   Whenever, you know the points would be too much or we would get up to where we were close to getting oral or termination or something like that, he would call us into his office and say, okay, you have this many points, and you need to be more careful so that you don't get any more.

Q.   Okay.  And is that what he said to you?

A.   Yes, something to that – close to that, yes.

Q.   But he told you that you had eleven points already; is that right – or did he say you were getting close to eleven points?

A.   I think he actually said that I was – he actually said I had more points than I should have, not that he gave me an exact number.

. . . .

Q.   So he didn't tell you you had more points than the number that would necessitate your being terminated, correct?

A.   No, he didn't say it exactly like that.

Q.   He just said you had more points than you should have?

A.   Right.

. . . .

Q.   So have you ever seen any documents showing you had accrued eleven or more points?

A.   I didn't ever actually see a document. I just remember him calling me in and telling me that.

Q.   And the best of your recollection what he said was, "You have more points than you should," or words to that effect; is that right?

A.   Yes. He said that I needed to be careful about being late or my call-ins and stuff, that I was getting – I had more points than I should have.

Long Depo. at 21-24.

Plaintiff's evidence thus amounts to statements Carter made to Long to the effect that she "had more points than she should have" and that she "needed to be careful" so as not to acquire more.   That is simply not at all the same thing as saying that Long had achieved the number of points that would require her to be terminated under UAB's attendance policy, regardless of what Long herself may have herself inferred. It could mean that Carter was simply warning Long that she was missing too many days or was being late too often for Carter's taste or that she was underlined approaching a point total necessitating disciplinary action under UAB's policy. Given Carter's express denial that he allowed any employee to remain employed after accumulating 11 points and the attendance records indicating that Long did not, in fact, accumulate 11 points, the Court concludes that the vague statements Carter made to Long do not create a disputed issue of material fact regarding whether Carter knew or believed that Long had the number of points that would have necessitated her discharge.   Such an inference cannot be drawn without engaging in speculation, and this is especially so given that the meeting between Carter and Long is wholly consistent with other undisputed record evidence,

namely that UAB's attendance policy required supervisors to warn their employees when they had accumulated five and eight points and that Long's attendance record shows she received such counseling from Carter on October 2, 1998 and July 12, 1999. The Court concludes that Plaintiff cannot escape summary judgment on her race-termination claims based upon the theory that Long received more favorable treatment under the attendance policy.

Plaintiff also contends that she can show that Heather Lunsford, another white employee, had accumulated 11 or more points and was not fired by Carter. Again, Carter denies that other employees had 11 or more points and were not fired, and the final attendance sheet he compiled on Lunsford shows her as having only 9.5 points. Plaintiff contends, however, that on one occasion Carter had given employees copies of their own attendance records, as compiled by him.[10] Plaintiff's Depo. at 27-28. At that time Plaintiff saw Lunsford holding her sheet, and Plaintiff asked Lunsford how many points she had. Lunsford allegedly replied in a fashion that Plaintiff herself described as "laughing and joking around," "Well, girl, please. I've probably got about – I don't know – about sixteen or more on here." Plaintiff's Depo. at 28-29. It might be assumed that this evidence reasonably suggests that Lunsford believed that she had more than 11 attendance points at that time. Again, however, the issue is not what Lunsford knew or believed, but what Carter knew or believed. Obviously, if Lunsford's attendance record sheet compiled by Carter showed that she had more than 11 points, such would create a genuine issue of material fact with respect to whether Carter afforded Lunsford

---

[10]These records, which have the individual employee's name at the top, are in the form of a chart, with columns entitled, "Point Accrued," "Date Accrued," "Day of the Week," "Reason for Point," "Running Total Accrued," and "Counseling Date." See Defendants' Exhibits I & R.

more favorable treatment than Plaintiff. But to the extent that Plaintiff offers her deposition testimony that Lunsford told her what her attendance sheet said in an effort to prove that such document actually reflected that Lunsford had accrued 11 or more points, it, like the employees' testimony about what Long told them about her attendance record, is not based upon personal knowledge and is inadmissible as hearsay. Fed. R. Civ. P. 56(e); Macuba, supra.

No testimony from Lunsford is contained in the record. Plaintiff also testified, though, that she herself saw Lunsford's attendance sheet. Plaintiff's testimony on what she saw thereon is admissible, the Court concludes, but Plaintiff admits that she did not see how many attendance points were reflected on Lunsford's sheet. Instead she states merely that she could see that "the paper was filled" with entries and that there were "more than eleven" of them. Plaintiff's Depo. at 29. Provided that there was some indication that each entry on the attendance reports given to the employees by Carter corresponded to the assessment of one or more points, it might be assumed that this testimony from Plaintiff would be sufficient to allow an inference that Lunsford's sheet showed that she had more than 11 points at that time. However, the evidence clearly shows just the opposite. An examination of employees' attendance sheet records show that entries routinely corresponded to the assessment of only one-half of one point or even no points at all. For instance, under UAB's policy, instances in which an employee was late were counted as only one-half of one point, as opposed to absences, for which one full point might be assessed. So an employee could in theory have 21 entries of one-half point each, and yet still be at only 10.5 points, below the termination level. Similarly, the records show that when an employee

would call in sick or injured on two or more consecutive days, the employee would be assessed one full point for the first day he or she was absent but no points for the days thereafter, although each day of absence was reflected as a separate entry on the employee's attendance sheet.[11]

Based upon the foregoing, it should come as no surprise that there are virtually always substantially more entries on an employee's attendance record sheet than the number of points that have actually been assessed against him or her. See employee attendance records in Defendants' Exhibits Q and I. For example, upon Plaintiff's termination, she had been assessed 11.5 points, but she had 23 separate entries on her record, because 17 were for one-half point each, and there were another 2 entries for which no points were tabulated for days where she called in sick on successive days. But most significant for the analysis here is Lunsford's final generated attendance sheet, showing her record as of May 7, 1999. It has 17 entries, which would be consistent with Plaintiff's testimony that she saw a sheet that was "filled" with "more than eleven" entries. Indeed, it would even be consistent with Lunsford's statement, "I've probably got about – I don' know – about sixteen or more on here," if one assumes that Lunsford was referring to the number of entries on her sheet rather than the number of attendance points those entries reflected. However, Lunsford's last attendance sheet shows that she had accumulated only 9.5 points based upon those 17 entries, because 11 were for one-

---

[11]Furthermore, because the attendance policy employed a 12-month floating period, points would be dropped one year after they were assessed. But the prior instances for which the points had been assessed remained on the attendance records maintained by Carter. Thus, one employee, Tausha Bettis, had 22 entries as of March 24, 2000, but then had only 5 points, because 12 of the entries were for points assessed and dropped after 12 months. However, the Court notes that none of the entries on Lunsford's attendance sheet were of this variety.

half point each and two carried no penalty points. The Court concludes that, unless one engages in speculation, there simply is no way to determine from Plaintiff's testimony regarding the number of entries she claims she saw on Lunsford's sheet that that sheet reflected that Lunsford had accumulated 1 or more points. As Plaintiff points to no other admissible evidence tending to show that any employee of another race was treated more favorably for violations of UAB's attendance policy, the Court concludes that Plaintiff has failed to establish a prima facie case on her claims alleging racially discriminatory discharge. Accordingly, summary judgment will be granted on those claims brought under Title VII and Section 1983.

### 2. The Promotion Claims

At her deposition, Plaintiff contended that, because of her race, she was denied an MCLA position that Carter awarded to a white employee, David Bush. The record shows that Bush was given this job effective August 1, 1999. See Defendants' Exhibit R. Defendants argue that Plaintiff raised no promotion claim in her complaint and that she should be barred from now attempting to pursue one. However, the Court concludes that even assuming Plaintiff's complaint does encompass such a claim,[12] Defendants are entitled to summary judgment upon it. On the merits, Defendants maintain that Plaintiff cannot prevail because she cannot

---

[12]It would appear likely that Plaintiff's complaint gives Defendants fair notice of this claim. Plaintiff specifically states therein that "Carter treated black employees differently than white employees in regards to work assignments and duties," Complaint ¶ 33. Immediately thereafter she alleges that Carter had, upon Plaintiff's transfer to the lab, promised her an MCLA position, id. at ¶34, but that after her transfer "a white male, David Bush, was given the position of MCLA" instead. Id. at ¶ 35. While Plaintiff does not use the word "promotion" in connection with these allegations, there is no dispute that an MCLA position would involve an increase in pay for Plaintiff and would thus be a promotion.

rebut the evidence indicating that Defendants had legitimate, non-discriminatory reasons for promoting Bush instead of Plaintiff. Defendants' Brief at 21. Carter testified that he made decisions on who was going to be promoted to MCLA positions based primarily upon (1) employees' productivity, as measured by how many collections per hour each employee performed; (2) their attendance; and (3) whether they had been trained on the lab's computer systems. Carter Depo. at 27-28. The Court concludes that, assuming Plaintiff can establish a prima facie case indicating that she was discriminatorily denied the MCLA job given to Bush,[13] Carter's testimony on this point is sufficient to satisfy Defendants' burden of production under the intermediate step of McDonnell Douglas. See Burdine, 450 U.S. at 254-256.

In order to survive summary judgment on her promotion claims Plaintiff must now create a genuine issue of material fact as to whether the reasons advanced by Defendants are merely a pretext for race discrimination. Bogle v. Orange County Bd. of County Com'rs, 162 F.3d 653, 658 (11th Cir. 1998). In other words, Plaintiffs must provide sufficient evidence to allow a reasonable fact finder to conclude, at a minimum, that the proffered reasons were not actually the motivation for the failure to train and promote them. See Combs v. Plantation

---

[13]A plaintiff may establish a prima facie case of racially discriminatory failure-to-promote by showing (1) that she is a member of a racial group; (2) that she sought and was qualified for the position the employer was attempting to fill; (3) despite her qualifications she was rejected; and (4) that after their rejection the employer either continued to attempt to fill the position or in fact filled it with a person of another race. See Walker v. Mortham, 158 F.3d 1177, 1186 (11th Cir. 1998) (citing Crawford v. Western Elec. Co., 614 F.2d 1300, 1315 (5th Cir.1980)). Plaintiff testified that she, an African-American, was qualified for and applied for the MCLA position but was rejected in favor of Bush, a white employee. Thus, it would appear that the assumption that Plaintiff could establish a prima facie case is likely valid.

Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997), cert. denied, 118 S.Ct. 685 (1998).
Plaintiff may do this (1) by showing that the legitimate nondiscriminator reasons
should not be believed; or (2) by showing that, in light of all of the evidence,
discriminatory reasons more likely motivated the decision than the proffered
reasons. Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996). See
also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000)(holding
that "a plaintiff's prima facie case, combined with sufficient evidence to find that
the employer's asserted justification is false, may permit the trier of fact to conclude
that the employer unlawfully discriminated," but cautioning that such a showing
may not always be adequate to sustain a finding of unlawful discrimination).
However, in order to show that an employer's proffered reasons are merely a
pretext, an employee must meet the reasons head on and rebut them  and the
employee cannot succeed by simply quarreling with the employer's wisdom in
selecting certain criteria for making an employment decision, at least where the
reasons offered might motivate a reasonable employer.  See Chapman v. AI
Transport, 229 F.3d 1012, 1030 & n.18 (11th Cir. 2000) (en banc).

While Plaintiff has offered her opinion as well as those of other African-
American lab employees that they believed Carter favored whites in his supervision
of the lab generally, she offers no evidence that she or any other employee ever
heard him utter an epithet or make any other statement showing racial bias.  Nor
has Plaintiff offered evidence undercutting Carter's assertion that he based
promotion decisions primarily upon productivity, attendance, and computer
training.  Defendants have submitted evidence showing that Carter gave Bush high
marks all around, including in productivity and attendance, on a performance

Page 24 of 37

appraisal form Carter completed in July 1999, immediately before he granted Bush the MCLA position.  There is no dispute that Plaintiff and Bush had each received the requisite computer training, but Plaintiff has offered no evidence tending to show that she had better attendance or productivity than Bush.  Indeed, the evidence establishes that although Bush had worked in the lab for a slightly longer period than Plaintiff had,[14] Bush had accumulated only 1.50 attendance points up to the time he was promoted, while Plaintiff had accumulated at least 9.30 points.  Plaintiff suggests that she should have been promoted instead of Bush because she had been employed within the UAB system longer and because she had been a certified phlebotomist "for years."  Plaintiff's Depo. at 44-45.  However, this does not create a question of fact on the issue of pretext.  Plaintiff's assertions do not directly address the specific reasons offered by Defendants indicating why Bush was promoted, but rather merely suggest that Carter should have used different criteria for making promotion decisions.[15]  The Court concludes that Defendants are entitled to summary judgment on Plaintiff's claims relating to the MCLA position awarded to Bush.

### 3.  The Shift Assignment Claims

Plaintiff also claims in her complaint that she was subjected to disparate treatment because of race in that she was denied an earlier shift that was awarded to a white employee, Dana Jackson.  See Complaint ¶¶ 33, 34, 36  In her

---

[14]The record indicates that Plaintiff was transferred to the lab in January 1999 while Bush was hired to work there in November 1998.

[15]The Court would note that while Plaintiff admitted she was unaware of whether Bush had any kind of certification prior to his promotion, see Plaintiff's Depo. at 44-45, Bush's formal application for the MCLA promotion indicates that he had received phlebotomy certification in 1989. See Defendants' Exhibit R.

deposition, Plaintiff explained that she worked a shift from 8:00 a.m. to 4:00 p.m. but that she wanted an earlier one so she could get home sooner and spend more time with her 19 year-old son after he arrived home from school. Plaintiff's Depo. at 18-19. Plaintiff states that when she transferred to the lab in January 1999, Carter told her that the only shift he had available for her then was the 8 to 5 shift but that she could have an earlier shift when one became available. Id. Plaintiff claims, however, that about a month after Jackson began working in the lab and the evidence indicates she was hired June 21, 1999, see Defendants' Exhibit C, she was allegedly given a shift that began at 6:30 or 7:00 a.m. and ended at about 3:30 or 4:00 p.m. See Plaintiff's Depo. at 34-37.

Defendants have not offered evidence disputing the foregoing allegations. Nor do Defendants attempt to explain why Jackson, and not Plaintiff, was given the earlier shift. Instead, Defendants address this particular claim only insofar as they assert generally that the evidence shows that, aside from her termination and being passed over for a promotion, Plaintiff did not suffer any adverse action sufficiently substantial enough to be cognizable under federal anti-discrimination law. See Defendants' Brief at 22. The evidence here indicates that even had Plaintiff received the earlier shift, such would not have entailed a material change in any other aspect of her job. Accordingly, the issue facing the Court is whether the failure to award Plaintiff the earlier available shift, standing alone, is actionable. The Court concludes that it is not.

The relevant provision of Title VII prohibits discrimination with respect to an employee's "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a). "Courts have uniformly read this language to require a

plaintiff suing under § 2000e-2(a) to establish, as part of his prima facie case, that he suffered so-called 'adverse employment action.' " Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1238 (11th Cir. 2001) (citation omitted). The same terminology and principles have been applied by courts considering § 1983 claims where public employees have complained that some action by their employer violates the constitution. See, e.g., McCabe v. Sharrett, 12 F.3d 1558, 1562 (11th Cir. 1994); Goffer v. Marbury, 956 F.2d 1045, 1049 & n. 1 (11th Cir. 1992). It is clear, however, that not all conduct by an employer negatively affecting an employee constitutes adverse employment action. Id. "Otherwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996) (quoted with approval in Doe v. Dekalb County School Dist., 145 F.3d 1441, 1449 (11th Cir. 1998)).

Rather, "there is some threshold level of substantiality that must be met for unlawful discrimination to be cognizable." Wideman v. Wal-Mart Stores Inc., 141 F.3d 1453, 1456 (11th Cir.1998). In other words, the adversity of an employment action must be material, and it is not enough to show that it "imposes some de minimis inconvenience or alteration of responsibilities." Doe, 145 F.3d at 1453. Thus, the Eleventh Circuit has recently held that, while the statute does not require proof of direct economic consequences in all cases, "to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment. Davis, 245 F.3d at 1239 (emphasis original). "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling;

the employment action must be materially adverse as viewed by a reasonable person in the circumstances." Id. (citing Doe, 145 F.3d at 1453).

"In a Title VII case, a transfer to a different position can be 'adverse' if it involves a reduction in pay, prestige or responsibility." Hinson v. Clinch County, Georgia Bd. of Educ., 231 F.3d 821, 829 (11th Cir. 2000). However, the evidence here indicates that none of these things was implicated in denying Plaintiff the earlier shift; only the start and end time of the shift was different from the one Plaintiff had. It might be accepted that "[a]ssigning an employee to an undesirable schedule can be more than a 'trivial' or minor change in the employee's working conditions. Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 786 (3rd Cir. 1998). Indeed, there have been cases indicating that an employee has suffered an adverse employment action based upon a transfer to a shift with substantially different and at least potentially much less desirable work hours, such as from a day shift to a night shift. See id. and cases cited therein; Freedman v. MCI Telecommunications Corp., 255 F.3d 840, 844 (D.C. Cir. 2001); Strouss v. Michigan Dept. of Corrections, 250 F.3d 336, 341 (6th Cir. 2001) (stating in dicta that an employee's transfer from a 5:30 a.m.-2:30 p.m. shift to a 2:00 p.m.-10:30 p.m. shift that interfered with the plaintiff's ability to pursue her education was an adverse employment action). But see Benningfield v. City of Houston, 157 F.3d 369, 377 (5th Cir. 1998) (holding that the plaintiff's transfer to the night shift, without more, was insufficient to constitute an adverse employment action for purposes of a § 1983 retaliation claim). Even so, the shift Plaintiff had was only about an hour or an hour-and-a-half later than the one she wanted. Accordingly, the failure to give Plaintiff the earlier shift she wanted does not implicate any substantial hardship

potentially connected with the more drastic work schedule changes that have been found actionable. While Plaintiff appears to have attached a special significance to having the earlier shift because it would have allowed her to spend more time with her adult son, when viewed objectively there is nothing inherent in the earlier shift that renders it superior to the one Plaintiff had. There was no difference in pay or job responsibilities, and Plaintiff herself acknowledges that other lab employees might reasonably prefer the schedule she had to the earlier one because it would have allowed them to sleep in a little bit later. Based upon the foregoing, the Court concludes that Defendants' failure to give Plaintiff the slightly earlier shift she wanted imposed nothing more than a <u>de minimis</u> inconvenience upon Plaintiff and that it does not, therefore, constitute an adverse employment action for purposes of her claims under Title VII or § 1983. See <u>Flannery v. Trans World Airlines, Inc.,</u> 160 F.3d 425, 428 (8th Cir. 1998) (holding that although it appeared that there had been changes in the plaintiff's working conditions, including a change in her hours, there had been no adverse employment action where the plaintiff had failed to establish that any of the changes caused her any significant disadvantage); <u>Wu v. Pacifica Hotel Co.,</u> 2001 WL 492475, *4 (N.D. Cal. 2001) (minor alterations in the plaintiff's work shift schedule were not actionable); cf. <u>Mingo v. Roadway Express, Inc.,</u> 135 F.Supp.2d 884, 901 (N.D. Ill. 2001) (no adverse employment action based upon the employer's denial of plaintiff's request to allow her to switch from a "five-on/two-off" to a "seven-on/seven-off" work schedule, which would not have otherwise altered the plaintiff's job). The Court concludes that Defendants are entitled to summary judgment on these claims.

### 4. Work Station Assignments

Plaintiff also claims that she was subjected to disparate treatment based on allegations that she and other African-American employees were given less favorable work station assignments than white employees. In particular, Plaintiff charges that she and other African-American employees seemed to have been kept in the collections area, where they were not permitted to stand, while white employees were rotated to work stations where they were allowed to sit more regularly. However, Defendants have submitted work schedules indicating that most of the employees in all areas were African-American and that both black and white employees were, in fact, rotated to the different areas. See Defendants' Exhibit E. The Court concludes that Plaintiff's evidence, comprised of employee testimony that they felt that white employees received better work assignments, is insufficient to create an issue of material fact. Accordingly, summary judgment will be granted for Defendants on these claims.

## 5. Computer Training

In her brief, Plaintiff suggests that she can make out a claim of disparate treatment based upon evidence indicating that African-American employees did not receive the same opportunities to receive computer training that allowed employees to perform non-collections duties and made them eligible for promotions to MCLA positions. See Plaintiff's Brief at 39-40. An employer would violate Title VII if it failed to offer training to employees on the basis of race. See 42 U.S.C. § 2000e-2(d).[16] This claim is not raised in the complaint. However, even assuming that it

---

[16] 42 U.S.C. § 2000e-2(d), provides: "It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training."

was, the evidence shows without dispute that she cannot recover upon it. Regardless of whether African-American lab employees <u>in general</u> were not trained or not trained as quickly on the computer system as similarly situated whites, Plaintiff testified that she <u>herself</u> received the computer training in question about "a month or so" after she was transferred to the lab, see Plaintiff's Depo. 77-78, and there is no indication whatsoever that Plaintiff's own employment has been adversely impacted by any supposed lack of computer training or any undue delay in receiving it. Thus, Plaintiff herself has not suffered any adverse employment action with regard to computer training. A "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." <u>Warth v. Seldin</u>, 422 U.S. 490, 499 (1975). "The mere fact that an aggrieved private plaintiff is a member of an identifiable class of persons of the same race or national origin is insufficient to establish his standing to litigate on their behalf all possible claims of discrimination against a common employer." <u>General Telephone Co. of Southwest v. Falcon</u>, 457 U.S. 147, 159 n. 5 (1982). Defendants are entitled to summary judgment on these claims.

### 6. Miscellaneous Actions

Finally, Plaintiff seems perhaps to argue that she might recover for disparate treatment under Title VII and/or § 1983 based upon allegations (1) that Defendants failed to respond to complaints of African-American employees, see Plaintiff's Brief at 39-42, 46-47; (2) that Kathy Goolsby, Flo Peter's supervisor, allegedly told the employees performing collections duties, who were mostly African-American, that they were not to talk with lab technicians, who were allegedly mostly white, <u>id.</u> at 38-39; and (3) that Pat Franklin allegedly told several black employees that they

would have had Memorial Day off but that they had instead been off on Martin Luther King Day.  The Court concludes, however, that, even if shown to have occurred, none of these are adverse employment actions capable of forming the basis of a race discrimination claim under Title VII or § 1983.  Nor do these actions rise to the level of an actionable hostile work environment.  Defendants are entitled to summary judgment on these claims.

### B. The Retaliation Claims

Plaintiff asserts claims under Title VII and § 1983 that Defendants discharged her in retaliation for complaints she made against Carter and in opposition to race discrimination.  In addition to prohibiting employers from discriminating on the basis of race, Title VII makes it unlawful

> for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].

42 U.S.C. § 2000e-3(a).  As to Plaintiff's retaliation claims brought under § 1983, the Court notes that that statute "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes."  Baker v. McCollan, 443 U.S. 137, 144, n. 3 (1979).  However, claims that a public employer has taken retaliatory action against its employee based upon the employee's expressive activity are cognizable under the First Amendment.  See Watkins v.

Bowden, 105 F.3d 1344, 1354 (11th Cir. 1997).[17]

Once again, Plaintiff relies upon circumstantial evidence to prove these claims.  With respect to the Title VII retaliation claim, Plaintiff must first prove a prima facie case by showing (1) that she engaged in activity protected under the statute; (2) that she suffered an adverse employment action; and (3) that there is a causal relation between the two.  See Bass v. Board of County Com'rs Orange County, Fla., 256 F.3d 1095, 1117 (11th Cir. 2001).  In order to establish a prima facie case of unlawful retaliation under the First Amendment, the employee must similarly show that (1) her speech is on a matter of public concern; (2) her First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; (3) the employee's speech played a substantial part in the employer's decision to discharge the employee.  See Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir. 1989).

The Court will assume that Plaintiff has engaged in expression that is protected by both Title VII and the First Amendment by virtue of her alleged complaints that Carter was racist and that he made employment decisions in the lab reflecting such a bias.  Plaintiff claims that she made such complaints to co-employees on a number of occasions, including the day before she was terminated,

---

[17]In connection with her § 1983 claims, Plaintiff alleges that Carter "retaliated against [Plaintiff] when she made complaints against [him] and complaints of race discrimination," Complaint ¶ 134.  However, the only constitutional provision Plaintiff seems potentially to invoke is the Equal Protection Clause, see id. at ¶ 133, which has no application to an employee's claim that she was subjected to retaliation because of her expressive activity.  See Watkins, supra.  Nonetheless, because Defendants do not raise Plaintiff's failure to invoke the proper constitutional provision, the Court will simply proceed to consider the claim under established First Amendment standards.

and also to the representatives preparing to attend the Committee meetings arranged by human resources. The Court would note, however, that it appears that Plaintiff's remarks to the nurse the day before she was terminated that Carter should hire more competent employees and give them more training are not protected under Title VII because such complaints cannot reasonably be considered opposition to any employment practice made unlawful under Title VII. See Clark County School Dist. v. Breeden, 121 S.Ct. 1508, 1509-10 (2001). Nor would it seem that those complaints are protected by the First Amendment, because rather than addressing matters of public concern, they appear to be merely "an example of the quintessential employee beef: management has acted incompetently." Murray v. Gardner, 741 F.2d 434, 438 (D.C. Cir. 1984). Nonetheless the Court will assume at this point that even Plaintiff's complaints to the nurse are protected for purposes of her retaliation claims.

However, regardless of whether a retaliation claim is brought under Title VII or under the First Amendment, an employee must show, at a minimum, that the relevant decisionmaker was aware of the employee's protected expression at the time the adverse employment action was taken. See Bass, supra (Title VII); Powell v. City of Montgomery, 56 F.Supp. 2d 1328, 1332 (M.D. Ala. 1999) (First Amendment); Wallace v. School Bd. of Orange County, Fla., 41 F.Supp 2d 1321, 1327 (M.D. Fla. 1998) (same). The reason is obvious: if there is no dispute in the evidence that the decisionmaker was not aware of the employee's protected expression when the adverse action was taken, there is no possible way that such action could have been motivated by the expression. The decisionmaker's awareness of the plaintiff's protected expression may be proven by circumstantial

evidence. See Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993). But that awareness may not be inferred based only upon a close temporal proximity between the expression and the adverse action taken. See Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1355-56 (11th Cir. 1999). See also Raney v. Vinson Guard Service, Inc., 120 F.3d 1192, 1197 (11th Cir. 1997) ("[O]ur cases have required plaintiffs to show a defendant's awareness with more evidence than mere curious timing coupled with speculative theories").

Carter denies that he had any knowledge of Plaintiff's complaints prior to his making the decision to terminate her employment. Thus, in order to make out a prima facie case on her retaliation claims, Plaintiff must present evidence that would allow a factfinder reasonably to make a determination to the contrary. To that end, Plaintiff theorizes that at least some of her complaints were likely relayed to Carter by Tyrone Williams, one of the lead MCLA's working in the lab. Plaintiff and several other African-American employees testified that they believed Carter hired Williams, who is himself African-American, as a "spy" to report what the other African-American employees were doing and saying. They further indicated that there were occasions where it seemed that Williams had reported things to Carter because Carter would be aware of things and sometimes reprimand employees immediately after Williams had gone to Carter's office. Such evidence might be sufficient circumstantial evidence reasonably indicating that Williams had reported what he had seen or heard to Carter on those particular occasions. See Goldsmith, supra. And it might be assumed that there is sufficient evidence indicating that Williams was aware of at least some of Plaintiff's complaints, as Plaintiff states that Williams overheard her and other employees complaining about Carter on the day

before Plaintiff was fired.  Nonetheless, the Court concludes that there simply is not sufficient evidence to indicate that Williams actually ever spoke with Carter at any time about any of Plaintiff's complaints in question.  Plaintiff's assertions that Williams probably told Carter about Plaintiff's protected activity because evidence suggests he told Carter about some things he saw or heard in the lab on some other unspecified occasions are based upon conjecture and are insufficient to create an issue of material fact.  See <u>Clover</u>, 176 F.3d 1354-55; <u>Raney</u>, 120 F.3d at 1197-98.  Therefore, the Court concludes that Plaintiff has failed to present sufficient evidence to establish a causal connection between Plaintiff's complaints and her termination.   Because Plaintiff cannot prove a prima facie case, Defendants are entitled to summary judgment on Plaintiff's retaliation claims brought under Title VII and § 1983.

## IV.  CONCLUSION

Based upon the foregoing, the Court concludes that Defendants' motion for summary judgment (Doc. 16) is due to be **GRANTED**.  The Court has reviewed the record and has determined that there is no genuine issue of material fact and the Defendants are entitled to judgment as a matter of law on all claims.  This action shall be **DISMISSED** with prejudice.  A separate order will be entered.

**IT IS SO ORDERED**, this 5th day of September, 2001.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE